[Civ. No. 11740.   First Dist., Div. Two.   Feb. 10, 1942.]

EUGENE JONES, a Minor, etc., et al., Respondents, v. ADA BAYLEY et al., Appellants.

Cooley, Crowley & Supple, Leighton M. Bledsoe and Norman S. Menifee for Appellants.

John J. Taheny and Edmund Scott for Respondents.

DOOLING, J. pro tem.— Defendants, husband and wife, appeal from a judgment for plaintiffs after a jury verdict allowing damages for personal injuries received by plaintiff

Eugene Jones as a result of being struck by an automobile driven by defendant wife. Appellants make no claim that the damages allowed were excessive and concede that the evidence supports the verdict. Their claim on appeal is that the evidence was sharply conflicting and indeed preponderated in their favor, and that for this reason the alleged errors which they specify as grounds of appeal must be held to have been prejudicial. It will suffice to show the sharp conflict in the evidence that plaintiffs' theory was that young Jones was struck while crossing the street in a legally established cross-walk and defendants' theory was that he suddenly "lunged" in front of the automobile at a point 60 feet away from the cross-walk, and that either theory finds ample support in the testimony.

Appellants claim that the court was in error in refusing to give certain instructions requested by them. These instructions cover three separate subjects:

1. Appellants requested certain instructions on the presumption that the automobile of the defendants was driven in a lawful and proper manner. They rely largely in support of their claim that it was error to refuse these instructions upon *Westberg* v. *Willde,* 14 Cal. (2d) 360 [94 Pac. (2d) 590]. The case on this point is against their contention. Mrs. Bayley, the driver of the automobile, was a witness in her own behalf and testified fully to her version of the accident. In *Westberg* v. *Willde, supra,* the court said at page 367:

"We think it well to state here that in our opinion there is a substantial difference in the situation before a court where the question of the plaintiff's negligence is in issue, and both plaintiff and his witnesses testified to all his acts and conduct at the time of his alleged negligence, from a situation where the acts and conduct of a decedent are the issues before the court. In the first instance, all possible facts both in favor of and against the alleged negligence of the plaintiff are before the court, and it is difficult for us to perceive how any presumption as to his conduct can add to or detract from this evidence. Surely if this evidence conclusively supports the claim that he was negligent, then, according to our decisions cited above, the presumption as to his conduct has been dispelled. On the other hand, if the plaintiff has testified respecting his acts and conduct, and his testimony and that of his witnesses showed that he used ordinary

care for his safety, an instruction to that effect would not be of any assistance to him; but if such evidence did not clearly and unmistakably clear him of the charge of negligence, then an instruction which would place his testimony in a more favorable light than it would be without such instruction would seem to be uncalled for, if not improper. In such case the giving of any instruction as to the presumption of plaintiff's conduct would seem to be improper.''

Upon the authority of *Westberg* v. *Willde* the District Court of Appeal, Fourth District, said in *Stevenson* v. *Fleming*, 47 Cal. App. (2d) 225 [117 Pac. (2d) 717], at page 232:

"Defendant's instruction number 18, wherein the jury was told that each party was entitled to the presumption that every person takes ordinary care of his own concerns and that he obeys the law (sec. 1963, subd. 4, Code Civ. Proc.), should not have been given. Such an instruction may be proper under given circumstances in a death case but should not be given in a case where all the parties are alive and testify, and all facts are placed before the jury by the testimony of the parties and the witnesses.''

The question which has troubled our courts so long as to when it is proper and when improper to give the jury an instruction covering this presumption is definitely settled in *Westberg* v. *Willde, supra,* and the dividing line clearly marked and pointed out. It is to be hoped, for the benefit of trial courts and counsel, that the opinion of our Supreme Court in that case has laid for all time the ghost of doubt that for so long has haunted this particular question.

2. Appellant proposed the following instruction which was refused by the court:

"One whose faculties are impaired is required to exercise care sufficient to make good the defects and one whose hearing is defective is for that reason required to exercise greater care and caution for his own protection than would be required of one whose hearing is normal.''

The only evidence in the entire case to which this instruction could have been directed is here quoted:

"Q. Were you wearing glasses at the time of the accident?

"A. Yes.

"Q. They were not in thicker rims?

"A. No.

"Q. How long have you worn glasses?

"A. Oh, I would say roughly twelve years.

"Q. Are you near-sighted?

"A. Yes, sir.

"Q. Are those thick lenses you are wearing there?

"A. Pretty thick.

"Q. They are not bi-focals, are they?

"A. No, sir.

"Q. How long before this accident happened had it been since you had had your eyes examined?

"A. I couldn't say; within a month before.

"Q. Had you had new glasses a month before the accident?

"A. No, just a check up.

"Q. They made no change in your glasses at that time?

"A. No.

"Q. Was it recommended that you make a change?

"A. No, sir.

"Q. Before this accident happened, you had an impediment of hearing in your right ear, had you not?

"A. Yes.

"Q. How long had you had that?

"A. For quite a while, ever since I had mastoid.

"Q. You had a mastoid operation, did you?

"A. Yes.

"Q. How long ago?

"A. About thirteen years.

"Q. So the hearing in your right ear is bad, is it?

"A. Not as bad as it was.

"Q. Now, your left ear, how is the hearing in that?

"A. Good. . . .

"Q. At the time of this accident, was your hearing as good as it has been in the courtroom here; at the time of the accident, was it as good as it has been in the courtroom here?

"A. My hearing is all right.

"Q. I say at the time of the accident, could you hear noises as well as you have been able to hear people talk in the courtroom here?

"A. Yes."

This evidence is quoted in full to show how insubstantial is the claim of error in this regard. The evidence would not support a finding that the injured plaintiff's eyesight was not normal when wearing his glasses, as, he admittedly was at the time of this accident; and while it would support a

finding that the hearing in his right ear was to some indefinite extent impaired, there was no impairment of hearing in the other ear, and no evidence which would support a finding that his ability to hear was substantially or at all impaired by whatever indeterminate impairment may have existed in the one ear.

These observations sufficiently dispose of this specification, but it may be well to add that if the facts had justified the giving of an instruction on the *quantum* of care required of a person with impaired faculties the instruction as proposed did not accurately state the law and might well have misled or confused the jury.

■ The jury was properly instructed that negligence is failure to use ordinary care and that ordinary care is that care which persons of ordinary prudence exercise in the management of their own affairs. ■ A person with faculties impaired is held to the same degree of care and no higher. He is bound to use that care which a person of ordinary prudence with faculties so impaired would use in the same circumstances. (45 C. J. 996, 997; 5 Am. Jur. 765; 14 L. R. A. (N.S.) 648.) ■ This may require a more alert use of his other faculties to reach the standard of ordinary care, and the jury might well be so instructed in a proper case, but after defining ordinary care to the jury it would be misleading to instruct them without explanation or qualification that a person with impaired faculties "is required to exercise *greater* care," which the jury might reasonably understand to mean greater than "ordinary care" as defined in the instructions.

There is nothing in *Armstrong* v. *Day,* 103 Cal. App. 465 [284 Pac. 1083] in conflict with this conclusion. There the instructions on the subject were held properly refused and the court did not pass upon their form. While some of the language of the proposed instruction is taken from the opinion of the court in *Armstrong* v. *Day,* and some from other language appearing in *Furtado* v. *Bird,* 26 Cal. App. 152, 160 [146 Pac. 58], it has been often pointed out "that the text of a decision is not necessarily sound as an instruction to be given to the jury." (*McGeorge* v. *Charles Nelson Co..* 107 Cal. App. 148 [290 Pac. 75]; *Rosander* v. *Market St. Ry. Co.,* 89 Cal. App. 710, 718 [265 Pac. 536]; *People* v. *Russell,* 80 Cal. App. 243, 245 [251 Pac. 699]; *Lincoln* v. *Williams,* 119 Cal.

App. 498, 502 [6 Pac. (2d) 563]; *Soares* v. *Barson,* 12 Cal. App. (2d) 582, 585 [55 Pac. (2d) 1283].)

█ 3. Appellants proposed an instruction that the place where the accident happened was to be conclusively presumed to be outside of a business or residence district unless otherwise proved, together with two instructions in the following language:

"The *prima facie* speed limit on a highway outside of a residence or business district is forty-five (45) miles an hour."

"You are instructed that at the place where this accident occurred the speed limit was forty-five (45) miles an hour."

As proposed, the instructions were incomplete and might well have been either confusing or misleading to the jury. The pertinent statutory law is found in sections 511 and 513 of the Vehicle Code. The provisions applicable to a civil case are:

"Sec. 511. The speed of any vehicle upon a highway not in excess of the limits specified in this section is lawful unless clearly proved to be in violation of the basic rule declared in section 510 hereof. . . .

"The *prima facie* limits referred to above are as follows (followed by specifications in miles per hour for different situations)."

"Sec. 513. In any civil action proof of speed in excess of any *prima facie* limit declared in section 511 hereof at a particular time and place shall not establish negligence as a matter of law but in all such actions it shall be necessary to establish as a fact that the operation of a vehicle at such excess speed constituted negligence."

To tell the jury that the "speed limit" or the *"prima facie* speed limit" at the time and place of the accident is forty-five miles an hour gives them no legal guide for use in their deliberations. Such an instruction is meaningless standing alone. The legal effect of driving within the speed limit is explained in the first sentence of section 511 quoted above. The legal effect of exceeding the speed limit is explained in section 513. No instruction given by the court and none requested by appellants embodied or included the provisions of either. From the bald and unexplained instructions proposed the jury might well have erroneously concluded that if appellants' car was being operated at less than forty-five miles per hour, i. e., within the "speed limit" or the *"prima facie*

speed limit,'' the driving of the car at that speed could not be found to be negligence.

It is axiomatic that an appellant cannot complain of the failure to give a proposed instruction which is incomplete, meaningless or misleading, and no duty is imposed on the court to reframe or recast such a proposed instruction to correctly state the law. (*Nelson* v. *Southern Pacific Co.*, 8 Cal. (2d) 648, 653 [67 Pac. (2d) 682].)

A number of cases have been cited to us by appellants on this subject. In none of them was it held error to refuse to give a proposed instruction on the speed limit which did not embody an explanation of the legal effect to be given to the speed limit under the pertinent provisions of the Vehicle Code. In some of the cases the giving of an instruction on the speed limit was held proper, but in no case has it been expressly held proper to give such an instruction in the absence of an explanation of the legal effect of driving within or in excess of the limit prescribed.

As an example, in *Cavalli* v. *Luckett*, 40 Cal. App. (2d) 250 [104 Pac. (2d) 708], one of the cases chiefly relied on by appellants, the court says at page 256:

''The provisions of the basic speed law and the first paragraph of section 511 were sufficiently covered by other instructions. . . .''

The case therefore cannot be considered as authority for the giving of an instruction on the *prima facie* speed limit without explaining its effect under the first sentence of section 511.

Appellants argue that the trial judge was guilty of prejudicial misconduct in certain remarks made by him when a police officer was on the stand. The officer stated that his captain had instructed him not to leave the report of the accident in court, whereupon the following colloquy occurred:

''The Court. It's a funny thing, you may never leave anything in the Superior Court, and yet the first time one of you police get hurt you run for the Judge of the Superior Court. I don't know whether to keep this report or not. You know I have threatened some time to take them, and either put you in jail or hold it and see where I get. This might be a good time to do it. If one of you counsel will side with me I will.

''A. This has to come back by me.

"The Court. The point I am making is this, that every time the bank or anyone else comes in here with documents, they do not want to leave them, but they go down and file a will downstairs or leave deeds, but these police reports, I don't know, I think it is sometimes the smaller things in life that receive the greatest amount of attention and sometimes people lose the greatest things by looking at the smaller things.

"A. I will try to bring a copy next time, Judge.

"The Court. Well, we will have to have the original. In other words, that's one of the difficulties we have in our form of government; one department thinks it's a little superior to the other, and if you want to get anything from one department you have to bring suit to get it. . . .

"Mr. Bledsoe. This report is a public record, isn't it? . . .

"The Court. No, I don't think it is."

As the officer was leaving the stand the trial judge said:

"Thank you very much. I don't want you to think, officer, that I think anything detrimental of you or anything of that sort. I did not mean to say that at all."

In so far as any of the quoted remarks of the court might have been considered as casting any reflection on the weight or importance of the police report as evidence, if they could bear such a construction, it would seem to be sufficient to point out that the police report was not admitted in evidence and appellants do not claim that it was admissible. In so far as it is claimed that the remarks might be construed as a reflection on the character of the witness or the weight to be given to his testimony we do not think that anything said by the court can be so construed. His remarks were directed to a system and to the orders of the witness' superior and not at all to the witness' own conduct. Some of them might better have been left unsaid but we do not believe that they could in any respect have prejudiced appellants with the jury.

It is to be noted further: 1. That there was no objection, assignment of error or request to the court to admonish the jury to disregard the remarks. The error, if any, is therefore not available to appellants on appeal. (*Estate of Golden,* 4 Cal. (2d) 300, 310, 311 [48 Pac. (2d) 962]; *Hughes* v. *Hartman,* 206 Cal. 199, 206 [273 Pac. 560].) 2. The trial court in effect did admonish the jury in his remark addressed to the witness as he was leaving the stand that the court did not think or mean anything detrimental to the witness. 3. The

trial court fully instructed the jury to disregard in arriving at their verdict any comments that he had made in the course of the trial which might seem to them to indicate any opinion as to the weight of any testimony or the credibility of any witness. 4. The trial court in denying a new trial again passed upon the question of prejudice and the fact of prejudice must be clear to warrant an appellate court in overruling his conclusion that no prejudice resulted. (*Lafargue* v. *United Railroads*, 183 Cal. 720 [192 Pac. 538]; *Levens* v. *Stocco*, 5 Cal. App. (2d) 693, 695 [43 Pac. (2d) 357].) ▮ 5. The lack of any objection, specification of error, request for admonition or even comment by counsel lends credibility to respondents' claim that the court's remarks were made in a jocular way, which of course the cold record cannot show, and regarded by all as a mere pleasantry. (*Dawson* v. *San Diego Elec. Ry. Co.*, 82 Cal. App. 141, 153 [255 Pac. 215].)

▮ Upon cross-examination appellant Ada Bayley was asked, if she did not state in a conversation with the injured boy's mother "that you were very sorry and hoped that they collected $10,000 from you?" Objection was made and in the course of a running argument counsel for respondent said:

"I do not think she would express a desire unless she really felt liable."

The trial judge replied:

"Incidentally, that might be true, possibly later on."

The matter was then dropped and counsel proceeded to examine on another question. No objection, assignment of error or request for admonition was asked and everything said of the colloquy between the court and the police officer applies equally to this remark of the court. In addition the court's remark was trivial, in the course of a running argument, and if evidence on the subject had been introduced, which it was not, the court's remark in our judgment was correct. Such a statement if made by a defendant might well be construed by the jury as an admission of liability.

Finally the appellants argue that the matter of insurance was unnecessarily and prejudicially brought before the jury on *voir dire* examination of the jurors and in cross-examination of Mrs. Bayley.

The only claimed prejudicial questions asked on *voir dire* were asked of prospective jurors who were or had been engaged in the insurance business or of women whose husbands were or had been so engaged.

We may take the following statement from *Robinson* v. *Wada,* 10 Cal. App. (2d) 5 [51 Pac. (2d) 171], a case relied upon by appellants, as fairly stating the limits of proper examination on the subject of insurance on *voir dire*:

"While the probable prejudice resulting from any reference to insurance in an action for damages is universally recognized, it is likewise recognized that a plaintiff is entitled to a fair and impartial jury. Therefore the rule permitting counsel to ask in good faith whether a prospective juror is interested in a particular insurance company or in any insurance company has been established as a rule of necessity. The authorities, however, have quite definitely limited the scope of the examination along this line. . . . [Then quoting from *Arnold* v. *California Portland Cement Co.,* 41 Cal. App. 420 [183 Pac. 171].] 'But counsel must take pains to propound such questions in such a manner as not unnecessarily to convey the impression that the defendant is in fact so insured. It is misconduct on the part of counsel for plaintiff in such actions so to frame his question that it goes beyond what is reasonably necessary to serve the legitimate purpose of eliciting the facts he is entitled to adduce in order to secure a jury free from bias or prejudice, if it is also apparent that the question may fairly be said to have the effect of serving the illegitimate purpose of prejudicing the jury by fixing in their minds the idea that the defendant is protected by insurance against liability for negligence.' "

It was stated by counsel for appellants on the *voir dire* examination of some of the prospective jurors that appellant Alvin J. Bayley, who was not present in court, was a colonel in the army. Of the first prospective juror who stated that he was an insurance broker counsel for respondents asked:

"Did you ever place any insurance for a company insuring military men, I believe it is United Service Insurance Company of Texas?"

If the description "Insuring military men" was unnecessarily injected into the question it would at least come dangerously close to an infringement of the rule announced in *Robinson* v. *Wada, supra.* On the question of the good faith and necessity of this description "insuring military men" the trial court had before it on motion for new trial an affidavit of one Fred West from which it appears that the true

name of the company was not "United Service Insurance Company of Texas" but "United Service Automobile Association." If, as we must assume the trial court decided on motion for new trial, counsel for respondents were not certain of the correct name of the company and in good faith added the description "insuring military men" to make the designation of the company more certain we cannot say that the question in the form put was not reasonably necessary or unnecessarily suggested that the defendants were insured.

A prospective woman juror whose husband was in the insurance business was asked of her husband, "Do you know whether he handles insurance or places insurance for army officers?" The question seems to us proper and not unnecessarily to suggest that defendants were insured. A grocer's wife might properly be asked: "Does your husband sell groceries to army officers?" where one of the defendants was an army officer. The reasonable necessity of the question being the test it seems that an insurance broker might equally be asked if he sells insurance to army officers.

Several prospective jurors in the insurance business were asked whether the firm of Cooley, Crowley & Supple had handled any litigation arising out of their insurance business. Other questions were asked as to whether the prospective jurors had done any investigating or adjusting of claims. The first line of questions was properly addressed to the possible business relations or relation of attorney and client between the prospective jurors and defendants' attorneys. It is stretching an inference too far to argue that the inquiry whether the attorneys might have represented prospective jurors in litigation arising from their insurance business suggests that they must be representing an insurance company in the pending litigation. The propriety of the second line of questions is readily apparent. A man who had investigated and adjusted insurance claims might easily be biased in favor of defendants.

It is to be remarked that during the entire *voir dire* examination counsel for appellants sat by without interposing a single objection to any question now complained of. Ordinarily an attorney cannot without objection secretly nurse an unspecified error through the trial with the idea that it will constitute insurance against a possible defeat. It is only where error is aggravated and incurable that the point may be saved when it is not timely made in the trial court. (*Gray*

v. *Robinson,* 33 Cal. App. (2d) 177, 183 [91 Pac. (2d) 194];
*Kershaw* v. *Tilbury,* 214 Cal. 679, 691 [8 Pac. (2d) 109].)

On cross-examination appellant Ada Bayley was asked:

"Q. Do you remember that a man named Fred West came down to see you, who had his office at 114 Sansome Street in San Francisco, and he asked you for a report of the accident?

"A. Yes, he did.

"Q. Didn't you tell him that the boy ran or came from behind an automobile going in the opposite direction?"

Thereupon there was objection and argument and the witness finally gave a negative answer. It is now claimed that this examination was not in good faith because West was not called as an impeaching witness and that the sole purpose was to insinuate to the jury that defendants were insured.

"It is always proper, for the purpose of discrediting a witness by his own admissions, to interrogate him, on cross-examination, as to prior inconsistent statements without calling his attention to time, place, circumstances, and persons present." (*People* v. *Campos,* 10 Cal. App. (2d) 310, 317 [52 Pac. (2d) 251]; 27 Cal. Jur. 159, 160.)

On the question of good faith respondents' counsel filed an affidavit on motion for new trial which recited that Fred West, who is an insurance adjuster, had told affiant that he had interviewed Mrs. Bayley and could show that plaintiff came from behind a car going in the opposite direction. With these facts in mind it was proper for respondents' counsel to put the question to Mrs. Bayley if she had not made such a statement to West in an effort to get an admission from her to that effect. His failure to call West is readily explained by West's adverse interest and position. It is straying far afield to argue that reference in a question to a man named West "who had his office at 114 Sansome Street" and asked "for a report of the accident" was calculated to inform the jury that defendants were insured. The question was a proper preliminary question for the inquiry about the alleged contradictory statement.

In this opinion, we have carefully considered every claim of error made by appellants. Finding no error the judgment is affirmed.

Nourse, P. J., and Spence, J., concurred.