[Civ. No. 1637.   Fourth Appellate District.—January 15, 1937.]

DELLA S. LINDLEY et al., Appellants, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Respondents.

Swing & Swing for Appellants.

W. I. Gilbert for Respondents.

BARNARD, P. J.—This is an action for damages on account of the death of the husband and father of the respective plaintiffs, who was killed in a collision between an automobile driven by him and the engine of a freight train operated by the defendants. The court directed a verdict in favor of the defendants and the plaintiffs have appealed.

The accident occurred about 9 o'clock A. M. on February 1, 1933, at a railroad crossing about four miles easterly from Edom, a small station between Banning and Indio. From Banning to Indio the railroad track is on a down grade and for some miles on each side of the point of the accident the track is straight. From Edom to and beyond the point of the accident a paved public highway runs parallel to and approximately 150 feet north of the railroad. The surrounding country is desert with some desert growth. At the point of the accident a road runs southerly from the paved highway

and crosses the railroad at an angle of 54 degrees. Because this road runs at a slight angle the distance along the road between the paved highway and the railroad is 160 feet. This road is 20 feet in width at the railroad crossing and the record is silent as to its width at other points. This road slopes down as it leaves the highway and slopes up as it approaches the railroad. The lowest point on this road is 50 feet north of the railroad track, at which point the road is five feet lower than the rails. At a point 25 feet north from the first rail this road is three feet below the level of the rails. There is the usual crossing sign and for several miles westerly from the point of the accident the railroad track is elevated several feet above the adjoining ground.

For some eight years the Lindleys had lived about a half mile southerly from the crossing in question and for some years the deceased had taken his wife almost daily across this crossing and up the highway to Edom, where she taught school, and had gone for her at the close of the day's work. On the day in question he had taken his wife to her school and was returning to his home when the accident occurred. He was driving a 1933 Dodge sedan. No one saw him leave the paved highway and start southerly on the road in question, and the only eye-witness to the accident was the fireman on the train. He testified that the train consisted of 97 cars, 81 of which were loaded; that after they passed Edom the train was "drifting", using the brakes off and on and running between 35 and 40 miles an hour; that the day was clear and the sun shining; that he first saw the deceased's automobile when it was some 50 or 60 feet north of the railroad track; that it was then proceeding at four or five miles an hour; that there was a sag in the road and a little rise to the track; that "just before he got to the track he slowed up just a little bit more, which made me think he was going to stop"; that the automobile did not stop; that it was in plain sight and there was nothing to obstruct the view; that the automobile was about half on the track when it was hit by the left side of the engine; that when he first saw the automobile the engine was some 250 or 300 feet from the crossing; that when the automobile reached a point about 10 or 12 feet from the tracks he saw it was not going to stop and called to the engineer to put on the brakes; that at this time the en-

gine was perhaps 30 feet from the crossing; and that all of the brakes were put on but it was impossible to stop the train. Having testified at the inquest that it was impossible to tell whether or not the automobile had stopped, he explained at the trial that he watched it continuously from the time he first saw it and that it did not stop thereafter.

The engineer testified that he did not see the automobile from his side of the cab; that the engine was 20 or 30 feet from the crossing when the fireman told him to put on the brakes; that he blew the whistle for this crossing when he was a quarter of a mile away; that at that point the fireman turned on the bell which operated automatically; that he. had just finished whistling when the fireman told him to put on the brakes; and that he took his hand off the whistle cord and threw on the emergency. All five members of the train crew testified that the bell and whistle were sounded just before the accident happened. However, four truck drivers, who were operating trucks on the paved highway near the scene of the accident, testified that they heard no whistle or bell. Under the decisions this is sufficient to create a conflict in the evidence in that regard (*Rogers* v. *City of Los Angeles,* 6 Cal. App. (2d) 294 [44 Pac. (2d) 465], and cases there cited) and we must here assume that no such signals were given.

The first question presented is whether, under the circumstances shown by the evidence, the question of contributory negligence on the part of the deceased was one of fact which should have been submitted to the jury. This depends upon whether, under the facts and circumstances shown, the deceased violated the rule of caution commonly known as the ''stop, look and listen'' rule, which is thoroughly established by many decisions. While the appellants concede the general rule it is argued that the facts of this case bring it within an exception which must be applied where the view of a person crossing a railroad is partially obstructed and where the party in question has stopped or looked or otherwise taken precautions for his safety which are of such a nature as to make it a question of fact whether or not the amount of precaution taken was all that was to be expected from a reasonably prudent man under the circumstances. The appellants rely particularly on *Pietrofitta* v. *Southern Pac. Co.,* 107 Cal. App. 575 [290 Pac. 597], and *Walker* v. *Southern*

*Pac. Co.,* 38 Cal. App. 377 [176 Pac. 175]. In each of those cases the injured party stopped and looked a short distance back from the track, in each case his view along the track was somewhat limited, in each case he was traveling over a bad road requiring close attention to his driving, in each case he did not look again before entering upon the track, and in each case it was held that the question as to whether the care used was sufficient under the circumstances was one for the jury.

In seeking to bring themselves within the rule applied in these cases the appellants argue that the deceased in this case was traveling over a poor sandy road with a narrow approach to the track; that since he was traveling at an angle in a southeasterly direction he would have to look back over his shoulder in order to see this train approaching; that there were only a few places during the last 60 feet before he reached the track where he could have had a good view of the track over which the train was coming; that he was familiar with this road and the crossing and knew that from the time he left the highway up to a point about 60 feet from the track he could see a train coming from the west at least from the time it reached a point a mile away; that he knew that he could hear the whistle of a train for four or five miles if a whistle was sounded; that he knew that from a point 60 feet north of the tracks up to a point near the tracks his view would be obstructed and that he must make observations before entering that portion of the road; that it must be presumed that he knew that the law required that a bell or whistle be sounded at a distance of 80 rods from the crossing and kept sounding at intervals; and that he knew that if no train was in sight when he reached the point 60 feet north of the track and if he heard no whistle or bell as he traveled on from that point that there should be no train approaching and he would have time to cross the track in safety. It is then argued that he must be presumed to have used due care and must be presumed to have looked and listened and to have stopped, if necessary, before he reached the point 60 feet from the track and that, having seen no train and heard no whistle or bell, he had a right to presume that no train was approaching and it was for the jury to determine whether he was guilty of negligence in proceeding and, if so, whether such negligence proximately contributed to the accident. It

is further argued that the presumption that the deceased stopped and looked before he reached the point 60 feet north of the track is supported by the testimony of the fireman to the effect that he did not see the deceased's automobile until the same was about 50 or 60 feet north of the track, which indicates that the automobile must have been stopped and that its starting forward must have been what attracted the fireman's attention to it.

We are unable to find in the record any evidence to indicate that the road over which the deceased was traveling was not a good road or that driving over it required any unusual attention. Our attention is called to no such evidence and the only evidence we have been able to find in the record concerning this road is that it was about 20 feet wide where it crossed the track, that it sloped away from the highway and up to the railroad track, and that there were two depressions between the highway and the railroad track. The map and other evidence indicate that the angle of the road was not such as to have placed any unusual burden upon the driver of an automobile in looking to his right in the direction from which this train was coming.

Pictures were introduced in evidence by both appellants and respondents. While these pictures were taken some time after the accident in question the appellant Leland Lindley, who is an adult and who took the pictures introduced by the appellants, testified, as to several of these pictures, that they correctly depicted the scene as it appeared when he examined it the morning after the accident. It appears, without conflict, that between the highway and a point 60 feet north of the railroad track the view in the direction from which this train was coming was entirely unobstructed for at least one mile, and it clearly appears that this view was unobstructed for three or four miles. It also appears, without conflict, that the view in this direction was unobstructed during the last 15 feet before a traveler would reach the track. While the appellants argue that the view in this direction was obstructed during the intervening 45 feet by desert shrubs and telephone poles in such a manner that a clear view could be had at only a few places during that distance, the appellant. Leland Lindley testified that the view was obstructed at one point of the intervening distance and Mrs. Lindley testified it was obstructed at about three points. There is no evidence

of the width or extent of any of the ''points'' where the view was obstructed. Leland Lindley testified that he could see about a mile in the direction from which the train was coming at a point ten feet back from the track, at a point 25 feet back from the track, at a point 65 feet back from the track, at a point 70 feet back from the track, and that he would have a clear view for 500 feet at a point 50 feet back from the track. While Mrs. Lindley testified that there were three places in the intervening 45 feet where the desert brush was high enough to ''hide a freight train'' and that one of these was about 15 feet back from the crossing, she also testified that the bottom of the depression was about 15 feet back from the crossing, that the shrubbery was about five or six feet high, that the shrubbery was about as high as the rails of the track, and that she had stopped several times while riding with Mr. Lindley at a point 15 to 18 feet north of the track in order to watch a train coming and that at that point she could see the train at a semaphore, which the evidence shows to be 405 feet west of the crossing. Assuming that the shrubbery was five or six feet high and about the height of the rails, which were on an embankment, it is difficult to see how this could obstruct the view of a person sitting in an automobile on a road, the lowest point of which is five feet lower than the rails. While such shrubbery might obstruct the view of the rails themselves it could hardly obstruct the view of a train running on the rails. The pictures in the record, with the appellants' testimony concerning them, demonstrate that a person riding in an automobile on this road could have seen a train coming on this track for a long distance at any point between a point about 50 feet from the track and the track itself. It would further appear that the claimed obstruction at a point about 50 or 60 feet north of the track was only a partial one which was far from sufficient to completely hide a train.

The presumption that a person has used due care for his own safety will not apply when there is evidence to the contrary. We think the circumstances of this case are sufficient to rebut the presumption thus invoked. (*Koster* v. *Southern Pac. Co.*, 207 Cal. 753 [279 Pac. 788].) Not only is there direct evidence that the deceased did not stop during the last 60 feet before he reached the track, and that to look would have been to see the train at least during a considerable

part of that distance, but if we were to presume that he stopped and looked before he reached the point where his car was first seen by the fireman we must also presume that he then saw the train, for the undisputed evidence is that he would then have had a clear view for at least a mile and, under the undisputed evidence, the train must have been within that distance within the time he must be presumed to have looked, if any such presumption is indulged in.

In *Hoffman* v. *Southern Pac. Co.,* 101 Cal. App. 218 [281 Pac. 681], the court said:

"The test as to the existence of contributory negligence on the part of one who attempts to cross a railroad track ahead of an aproaching train is the question as to whether under such circumstances a reasonably prudent person would have undertaken to do so. When the circumstances of a particular case are of such a nature that different conclusions may reasonably be drawn as to the prudence of a person in attempting to cross a railroad track the question of contributory negligence becomes one for the determination of the jury."

■ Applying this test and viewing the evidence in the light most favorable to the appellants we think it must be held that a reasonably prudent person would not have undertaken to cross this track under the conditions then existing, and that the failure of the deceased to measure up to the fixed standard thoroughly established by law, under the circumstances shown by the evidence, establishes contributory negligence upon his part as a matter of law. We think the facts of this case bring it within the principles laid down in those cases where it has been held that the circumstances were not sufficient to justify a submission to the jury of the question of contributory negligence. Among such cases may be cited the following: *Koster* v. *Southern Pac. Co., supra; Young* v. *Pacific Elec. Ry. Co.,* 208 Cal. 568 [283 Pac. 61]; *Larrabee* v. *Western Pac. Ry. Co.,* 173 Cal. 743 [161 Pac. 750]; *Griffin* v. *San Pedro, L. A. & S. L. R. R. Co.,* 170 Cal. 772 [151 Pac. 282, L. R. A. 1916A, 842]; *Scherer* v. *Southern Pac. Co.,* 140 Cal. App. 528 [35 Pac. (2d) 356]; *Hughes* v. *Atchison etc. Ry. Co.,* 121 Cal. App. 271 [8 Pac. (2d) 853]; *Thompson* v. *Southern Pac. Co.,* 31 Cal. App. 567 [161 Pac. 21].

■ The only other point raised is that even if the deceased was guilty of contributory negligence the doctrine of last clear chance applies and the matter should have been

submitted to the jury. It is argued that when the deceased was 10 or 12 feet from the track the fireman realized that he was not going to stop, that the deceased could have stopped instantly at any time while he was traversing that 10 or 12 feet had he been warned of the approach of the train by the sounding of a whistle, and that the respondents had the last clear chance to avoid the accident by sounding the whistle during that time. It is equally true that the deceased could have avoided the accident by looking at any time during the same period. The fireman had a right to assume that the deceased would stop, especially since he slowed down shortly before reaching the track. When the fireman realized that the deceased was not going to stop the train was so close to the crossing that it was a matter of split seconds. It was the natural thing for him to think first of the application of the brakes and to act to that end. If, after calm reflection, it may be said that it would have been better to have blown the whistle which, in itself, would have taken an appreciable part of the time available it cannot be said that any chance which the fireman had to avoid the accident was a clear chance. Without taking the time to review the authorities we are satisfied that the doctrine of last clear chance has no application under the facts of this case, as presented by the record before us. (*Herbert* v. *Southern Pac. Co.*, 121 Cal. 227 [53 Pac. 65]; *Young* v. *Southern Pac. Co.*, 182 Cal. 369 [190 Pac. 36]; *Wallis* v. *Southern Pac. Co.*, 184 Cal. 662 [195 Pac. 408, 15 A. L. R. 117]; *Young* v. *Southern Pac. Co.*, 189 Cal. 746 [210 Pac. 259]; *New York L. Oil Co.* v. *United Railroads*, 191 Cal. 96 [215 Pac. 72]; *Palmer* v. *Tschudy*, 191 Cal. 696 [218 Pac. 36]; *Billig* v. *Southern Pac. Co.*, 192 Cal. 357 [219 Pac. 992]; *Bagwill* v. *Pacific Ry. Co.*, 90 Cal. App. 114 [265 Pac. 517]; *Rasmussen* v. *Fresno Traction Co.*, 15 Cal. App. (2d) 356 [59 Pac. (2d) 617].)

After reading the entire record we are of the opinion that the negligence of the deceased was of a nature which will not permit of a recovery in this case under any theory permitted by the established law of this state.

The judgment is affirmed.

Jennings, J., concurred.

Marks, J., Concurring.—See majority opinion in *Rasmussen* v. *Fresno Traction Co., supra.*

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 15, 1937.